[Civ. No. 7646.   Second Appellate District, Division Two.—January 31, 1934.]

GEORGE T. PORTER, Respondent, v. FRED GRANICH, Appellant.

Aaron Elmore for Appellant.

Davis & Thorne for Respondent.

STEPHENS, P. J.—This appeal was decided by this court September 29, 1933, and subsequently respondent, against whom the decision went, complained in a petition for a rehearing that the opinion failed to mention important facts. Upon a more particular examination of the transcript we became convinced that respondent was correct in this and we granted a rehearing.

This case is for damages both compensatory and punitive for false imprisonment. The case was tried before a jury and resulted in a verdict for plaintiff against defendant for $1,000 compensatory and $4,000 punitive damages. A motion for a directed verdict was made and denied. After the verdict had been returned a motion for judgment notwithstanding the verdict was duly made and denied by the court. A motion for new trial was made and denied. This appeal under section 953a, Code of Civil Procedure, is from the judgment following the verdict and from the rulings on the motions mentioned. The motion for new trial is not appealable.

The plaintiff (respondent) George T. Porter was the secretary and treasurer and later president of Universal Sales Company, hereinafter sometimes referred to as the Sales Company. This company was a customer of Fred Granich (appellant), who conducted a wholesale plumbing business. This business relation had extended for some time prior to the month of September, 1928. During said month four checks had been issued by the Sales Company to Granich for goods delivered, but the checks were not honored at the bank upon which they were drawn. Porter testified that the checks were dishonored only because of the temporary absence of the bank manager, with whom he had a credit arrangement for overdraft of more than the sums of these checks and this is borne out by the testimony of the manager. This arrangement, however, was unknown to Granich. Porter testified that a cashier's check was given to Granich for the sum of these checks; but that Granich had failed to redeliver the dishonored checks to him. The method of doing business between the two firms was that on small business the Sales Company was to have daily credit and on larger business the Sales Company was to pay as the money was received from the jobs. The progress was slow on some of the jobs and Granich had been urging payment, and on December 14, 1928, Granich called at the business office of the Sales Company and wanted payment of the balance due of $1200 in round figures. Considerable discussion, not all amicable, ensued and Granich demanded payment in full by Friday evening following. Porter testified that Granich told him that he had handled other accounts, he had collected other accounts that way,

that he would show him that he could get him arrested and throw him in,. until he did pay. Porter further testified that Thursday, the following day, Granich called by telephone asking if he was going to have that money Friday. The following is quoted from Porter's testimony: "If you do not have that money, I am going to make serious trouble for you, I would be sorry if I didn't dig up some money for him, and he wanted the full $1,200.00, he wasn't going to wait any longer." The conversation related at the business office was in the presence of a stenographer, who substantially corroborated Porter's account of it. A Mr. Levers, who had some relation with the Sales Company during the time referred to in this case, testified that Granich came to their place of business a few days before the arrest and talked about the account. He said Granich was pretty mad and said he would make serious trouble or "Hell for Mr. ·Porter," if he did not get his money. The witness told him Porter was at the bank trying to get matters straightened out. Granich said if he did not get the money he would have Porter arrested. He further testified as follows: "A. These conversations all took place within two weeks of the arrest of Mr. Porter. Q. Before or after? A. Before. I never saw Mr. Granich until yesterday, since. There was a question came up about collecting checks that were bad. He told me that there (were) ways of doing that, that if you worked with the police department, and I asked him about the method and he said, 'Well, you have to have friends in the police department and you take these checks to the friends in the police department and they will collect them for you.'" Friday evening about 5 o'clock two police officers entered his office and arrested Porter. The officers had the referred-to checks and showed them to Porter, who told them they had been paid. They answered that Granich claimed otherwise. Quoting one of the policemen as Porter testified, "That was not the story Granich told us." A little later they took Porter to jail. There Porter again stated that the checks had been paid, and that no crime had been committed. The captain in charge said, "Well, I will call up Mr. Granich." Whereupon he dialed Granich's number on the telephone and asked for Mr. Granich and then stated over the telephone

that Porter claimed the checks had been paid. Porter said he heard the captain say into the telephone, "Well, you be in in the morning and sign the complaint." Then he turned to Porter and said, "That's all there is today, that man is going to be in in the morning and sign a complaint against you, I will lock you up or you will have to give us $1200.00." Porter was locked up.

At the time Porter was sick and had seven boils on his face and neck. He was kept in jail until Sunday morning. While in jail he was placed in a tank or large cell containing the dregs of humanity as picked up in a large city indiscriminately thrown together. No heat was provided and the ventilators had to be left open to accommodate the number imprisoned with him. The latrine was foul and the bunks were lousy. He slept little, if any, during the imprisonment, but sat upon his bunk. The whole picture as related by Porter, and it is not denied in the main, is revolting to one who cherishes the doctrine that one is presumed to be innocent until proven guilty. Happily the old jail wherein the scene of this drama originated has long since been abandoned, and we fervently hope that the utter disregard for law and for the liberty of citizens that is evidenced by the facts of this case were wholly and forever discontinued along with the abandonment of the old Bastile. One witness (Mr. Levers) said Porter looked ten years older when released and that he had lost much weight. Porter testified that many people heard of his arrest and in his business he was humiliated by references to his having been in jail. During the imprisonment Porter was fingerprinted, photographed and herded out with the others for observation of those identifying criminals. He was taken to a room where writing tests were made and here again he explained the checks had been turned down through mistake and that they had been paid, and the officer in charge said to another, "If Granich wants this man held he will have to sign the complaint himself, I would not take a chance in this case." Soon after the arresting officer came in and Porter was released.

After that there was a meeting in the district attorney's office, both Porter and Granich being present, and after an examination of the case the deputy district attorney

refused to issue a complaint and Granich was angry, saying he wanted his money.

Paul Benjamin, an attorney at law employed by Granich, testified that Granich brought the four checks to his office a few days before the arrest, together with some accounts, and said he would like to get his money. Mr. Benjamin checked accounts and delivery of merchandise to see if they compared with the checks and finding that they did, made some inquiry at the bank and then went to the complaint department of the district attorney's office. Mr. Benjamin testified that he took the checks to the district attorney on December 14th, and told deputy Frampton what he knew about the matter. Frampton advised him to go to Captain Mailheau of the city police forgery detail and he did this and the arrest followed. Mr. Benjamin further testified that Granich did not instruct him to take the checks to the district attorney or police department nor did Granich know that this was being done. It may be noted that it does not appear that Mr. Benjamin was informed by Granich that he had long since received the money on the checks or that Porter claimed that the checks were dishonored through mistake at the bank. In fact, it is due Mr. Benjamin to say here that it nowhere appears that he knew of these important facts before the arrest. These are the general facts upon which the appeal lies. There are other incidental facts which we shall mention along with our analysis which follows immediately.

It should be noted in connection with Mr. Benjamin's testimony that he says Granich instructed him "to get his money" and did not instruct him to go to the district attorney or the city police. Mr. Benjamin, however, almost directly went to officers of the law without making any inquiry of Porter as to why the checks were unpaid and made no attempt whatever within proper legal methods to get the money. The conclusion almost necessarily follows that Mr. Benjamin got the idea that a crime had been committed directly from Granich. Coincident also, it may be mentioned here that the officers arresting Porter seemed not concerned so much about the crime—they would arrest Porter *if* the $1200 was not paid. Again, the payment was mentioned after the arrest and after Porter was incarcer-

ated in the jail. The jury was entitled to draw inferences from these facts that Granich did not believe the checks had been drawn to defraud anybody, he knew he had not been defrauded—and that he used them "to get his money" through the police and that all of these circumstances were not merely coincidences. Had either Granich or Mr. Benjamin or any of the others having to do with the arrest, done the obviously proper thing that Officer Crowley did, they would have found out that there was absolutely nothing to the criminal charge. It appears that things were progressing toward a criminal complaint, but this officer testified why it was never issued. Crowley testified: "I was handed the complaint, that is the preparation for a complaint—allegations—for investigation, and I went down to the city jail and called Mr. Porter out and talked with him about the case and was informed by him that he did not intend to commit a crime, that he had credit arrangements with the bank, I would check further into it and I would not sign the complaint. And so I did call the bank and the bank said that they had permitted him overdrafts, but they had stopped the overdrafts, and I asked them if they had informed him of the fact, and they said no, they hadn't given him notice, written notice to the effect that he had been cut off his credit. So, due to that fact, that he had originally had credit with the bank, and my experience on check cases, I did not believe we would be able to secure a conviction, and so I said I would not sign a complaint. I believe I called the complaining witness at that time and told him to come down to the district attorney's office the following Monday morning." It may here be noted parenthetically that the Sales Company checks cleared that same bank in the sum of $10,625.82 between the date of the checks mentioned and the arrest, and even after that and during the investigation in the district attorney's office Mr. Benjamin with Granich at his side argued for a complaint and when it was refused Granich "was mad".

We shall now particularly notice appellant's points as they are set out in the opening brief, the italicized text being the subheadings although we have abbreviated some of them:

**530**

*If the act of appellant's attorney binds the appellant the evidence shows that there was probable cause for the arrest as a matter of law because:*

*(1) The evidence shows that the respondent was guilty of an actual violation of section 476a of the Penal Code.*

*(2) There was reasonable cause to believe the offense had been committed.*

■    The evidence shows clearly that the firms had been doing considerable business over a continuing period of several months. The Sales Company had drawn other checks when their funds were not sufficient and they had always been made good. In this instance, as has been related the checks had been given and later covered by one certified check. From the time these checks were drawn to the date of the arrest thousands of dollars of business between the firms had been transacted. The money demanded by Granich on the occasion we are here concerned with, it would seem, had no relation to these checks. It is clear that there was never any intention to defraud anybody by the giving of the checks. The intention to defraud is a necessary element of section 476a of the Penal Code. Certainly Granich knew that there had been no intention to defraud through these checks when he was threatening Porter's arrest. Had Granich been in the fullest of good faith he would not have brought the checks into the controversy at all and the fact that he did is almost conclusive evidence that he used the checks because he had them in his possession and being marked unpaid they would add weight to his threats of arrest. If this is not true, upon what possible theory was he threatening arrest? We think there is ample evidence from which the jury could have determined as the verdict indicates it did determine, that no crime was committed and that there was no reasonable cause for anyone to believe that a crime had been committed, and that Granich set the whole affair in motion in order to get his money on the open book account.

The second assignment of error refers to the denial of the motion for a directed verdict and for judgment notwithstanding the verdict. Our comment already made disposes of this assignment.

The next assignment of error relates to the denial of the motion for new trial and although the attempted appeal on

this ground is ineffectual, appellant's points could be made under the appeal from the judgment. We therefore consider the points made. The claim that the evidence was insufficient has already been treated.

*Error in the admission and rejection of evidence.*

■ But one instance under this point need be referred to. It was sought to show through the pleadings and evidence in another civil suit that subsequent to the arrest Granich secured a judgment of $1200 against the Sales Company and that the checks involved herein were in that case. The court refused the testimony, but did not limit Granich from introducing any part of such proceedings found applicable. While parts of the evidence in the referred to case might have been proper as evidence in the instant case, the issues were different. We see no error in the court's ruling.

■ It appears that counsel for Porter mispronounced the name of Granich habitually during the trial and in the course of argument referred to Porter as an American boy. The inference is that counsel was purposely trying to prejudice the jury against a man with a foreign name. The point was not called to the court's attention during the trial and the court does not seem to have been impressed with it upon motion for a new trial. The trial judge was in a much better position to pass upon this point than we can possibly be. It does not appeal to us as an abuse of discretion.

*Absence of malice to justify the award of exemplary damages.*

■ The facts as revealed by the witnesses called on behalf of Porter, if believed, are sufficient upon which to base malice.

We have carefully reviewed all of the authorities cited in the briefs and we do not herein refer specifically to them for the reason that the law seems well settled and well understood by both parties to this litigation. The difference is in the conclusions of the opposing parties arrived at from the evidence. We have applied the well-known rule of assuming as proved that which is both supported by the evidence and necessary to the jury's verdict. Tested by this rule, we unhesitatingly decide this appeal in favor of respondent.

The appeal from the ruling on the motion for a new trial is dismissed. The rulings on the other motions are sustained.

The judgment is affirmed.

Craig, J., and Archbald, J., *pro tem.*, concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 29, 1934.